## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LIBERTY SALAD, INC. and 18th STREET SALAD, INC.**, on behalf of themselves and all others similarly situated,<br><br>**Plaintiffs,**<br><br>v.<br><br>**GROUNDHOG ENTERPRISES, INC. D/B/A MERCHANT LYNX SERVICES,**<br><br>**Defendant.** | **CIVIL ACTION NO. _____**<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiffs Liberty Salad, Inc. and 18th Street Salad, Inc., (collectively, "Saladworks" or "Plaintiffs"), by and through undersigned counsel, on behalf of themselves and all persons similarly situated, complain and allege as follows on personal knowledge, investigation of counsel, and information and belief.

### NATURE OF THE CASE

1.      This is a civil action seeking monetary damages, restitution, declaratory relief, and injunctive relief from Defendant Groundhog Enterprises, Inc., d/b/a Merchant Lynx Services ("Merchant Lynx" or "Defendant") arising out of Merchant Lynx's deceptive, fraudulent, unfair, and illegal business practices relating to its provision of credit and debit card payment processing services to merchants ("merchant services" or "payment processing services").

2.      Payment processing services generally refer to the manner in which a merchant can accept and process a customer's credit or debit card for a retail point-of-sale (POS) transaction.  Companies such as Merchant Lynx serve as an intermediary that provides the support and infrastructure to facilitate such transactions for merchants.  In addition to intermediaries like Merchant Lynx, payment processing also involve a number of other entities,

such as the merchant's bank (acquiring bank), the customer's card issuer (e.g., Visa or Mastercard), and the bank that issued the customer's card (the issuing bank, e.g., Wells Fargo or Bank of America), among others.

3.     Because of the complex, inter-connected web of entities and companies involved, the full nature and cost of payment processing services can be difficult for merchants, even sophisticated ones, to fully understand.

4.     Merchant Lynx exploits this complexity to its advantage, and to the detriment of merchants.

5.     Merchant Lynx entices merchants – primarily small businesses – with seemingly attractive and straightforward offers, to administer merchants' payment processing services.  For instance, Merchant Lynx offers "flat rate" plans under which Merchant Lynx promises merchants that they will only pay a single, fixed percentage rate of monthly credit and debit card sales for payment processing services.  Merchant Lynx also promises that it will not charge other fees, hidden fees, etc.

6.     Merchant Lynx's representations are false and misleading.  Once Merchant Lynx lures in a merchant, it will arbitrarily charge multiple fees and/or variable rates, none of which Merchant Lynx previously disclosed to the merchant.

7.     Merchant Lynx deliberately structures its business affairs and billing statements to obfuscate its wrongful conduct.  It will bury charges in long bills, which itself contradicts Merchant Lynx's initial representations that Merchant Lynx's "flat rate," "one rate," or other plans will streamline the merchants' bills.  Merchant Lynx also masks what certain fees or charges appearing on merchants' billing statements are even for, using vague and non-descriptive terms such as "dues and assessments" or simply "additional charges."  These and other fees or charges were not adequately disclosed to merchants initially.  Merchant Lynx has

also erected a labyrinthine and non-responsive customer service function to frustrate merchants' attempts to understand or fight undisclosed and unfair fees or charges.

8.      Merchant Lynx further attempts to insulate its wrongdoing by employing illusory, one-sided agreements, and failing to adequately train or inform its sales staff.  Merchant Lynx claims its so-called "merchant processing application" constitutes an agreement between Merchant Lynx and a merchant.  However, Merchant Lynx never signs any "merchant processing application" itself.  In fact, no one counter-signs it at all.  Instead, Merchant Lynx invokes the "merchant processing application" against a merchant when doing so is in Merchant Lynx's own self-interest, but Merchant Lynx may attempt to disavow the application when it could be construed against Merchant Lynx and in a merchant's favor.  And Merchant Lynx's vast web of sales representatives are told only what they need to know to sell the product.

9.      Even if Merchant Lynx's merchant processing applications constitute valid contracts, the fees and other amounts that Merchant Lynx charges merchants nevertheless violate the application's terms.

10.     Plaintiffs are two of Merchant Lynx's many victims.  Plaintiffs were lured in by Merchant Lynx's bait-and-switch scheme.  Merchant Lynx promised Plaintiffs substantial savings if they switched away from their existing payment processing services provider to Merchant Lynx.  Merchant Lynx offered Plaintiffs an all-in "flat rate."  However, shortly after switching to Merchant Lynx, Merchant Lynx started charging Plaintiffs multiple fees, at different rates, which had not been previously discussed or disclosed.  Merchant Lynx has stonewalled Plaintiffs' efforts to informally resolve these issues, or have promised to fix these issues, but has failed to adequately do so.

11.     Plaintiffs, therefore, bring this putative class action against Merchant Lynx on behalf of themselves and similarly situated merchants, asserting that Merchant Lynx's deceptive,

fraudulent, unfair, and/or unconscionable behavior violates Pennsylvania and other applicable law.

## JURISDICTION AND VENUE

12.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed class is a citizen of a different state than Merchant Lynx.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Merchant Lynx is subject to personal jurisdiction here and regularly conducts business in this District, Plaintiffs exist and do business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Pennsylvania and in this District.

## THE PARTIES

14.    Plaintiff Liberty Salad, Inc. is a Pennsylvania corporation with its principal place of business in Pennsylvania.  Liberty Salad, Inc. is a merchant in the retail food business that operates a "Saladworks" retail location at 1625 Chestnut Street, Philadelphia, PA, popularly known as the food court at Liberty Place.  This Saladworks location offers signature and build-your-own salads, wraps, and related food items to customers.  Plaintiff Liberty Salad, Inc. is under common ownership with 18th Street Salad, Inc.

15.    Plaintiff 18th Street Salad, Inc. is a Pennsylvania corporation with its principal place of business in Pennsylvania.  18th Street Salad, Inc. is a merchant in the retail food business that operates a "Saladworks" retail location on 18th Street, between Chestnut and Market Streets, in Philadelphia, PA. This Saladworks location also offers signature and build-your-own salads,

wraps, and related food items to customers.  Plaintiff 18th Street Salad, Inc. is under common ownership with Plaintiff Liberty Salad, Inc.

16.     Defendant Groundhog Enterprises, Inc. d/b/a Merchant Lynx Services is a Georgia corporation with its principal place of business in Florida.  Merchant Lynx operates and maintains offices in a number of states, including Pennsylvania, through which it markets and provides payment processing services to merchants.  Merchant Lynx regularly and systematically conducts business throughout Pennsylvania, this District, and elsewhere.

## COMMON FACTUAL ALLEGATIONS

### A.    Overview of Payments Industry and Payment Processing Services

17.     In today's business world, the vast majority of merchants accept payment for goods and services via credit and debit cards.  In order to do so, a merchant must utilize payment processing services that access the financial network that accepts this method of payment.

18.     Merchants rely on the companies that provide payment processing services to do so at a fair price and in accordance with fair and appropriate terms.  Fees for merchant services are likely the fourth highest expense most merchants incur, following rent and labor and product costs.

19.     Payment processing services directly and indirectly involve a number of different parties.  For instance, in addition to the merchant that receives payment and the customer who provides such payment, the processing of a card transaction is likely to involve (a) the bank that issued the credit or debit card to the customer (issuing bank, e.g., Chase or Bank of America); (b) the card association through which the transaction is processed (card issuer, e.g., Visa, MasterCard, Discover, or American Express); (c) the merchant's bank (acquiring bank), (d) the card association member bank (i.e., the bank from whom the payment is transferred, if different than (a) above); (d) the company that actually processes the payment (e.g., First Data); (e) the

company that sells or leases the payment processing equipment to the merchant (although the merchant is certainly allowed to own this equipment); (f) the company that provides the payment processing services to the merchant (e.g., ensures payments are processed, handles monthly billing, and maintains the relationship with the merchant); and (g) the Independent Sales Organization ("ISO") that enrolls merchants in the merchant acquirer's services.  Merchant Lynx provides payment processing services, enrolls merchants in an acquirer's services, and also sells or leases payment processing equipment to merchants.

20.     The number of involved parties and moving pieces make it very difficult for merchants, especially smaller merchants, to understand the process, how it works and how much it will cost.

21.     Such front-end explanation and clarity is critical because merchants typically seek to avoid regularly switching between payment service providers because of the transition costs and business disruption.    Additionally, early termination fees may apply.    For instance, Plaintiffs' prior payment services provider, before Plaintiffs were induced to switch to Merchant Lynx, charged a $495 cancellation fee.

22.     Unfortunately, some payment processing servicers take advantage of their position.  They induce "mom and pop" merchants to purchase services without disclosing fees they know the merchant will be charged.  They also set up contractual relationships that bind the merchant but not themselves and bury unconscionable and self-serving provisions in the middle of their fine print form contracts.

23.     Companies engage in such tactics because they receive profits every month as long as they can keep customers from leaving to competitors.

24.     Merchant Lynx is on the frontline as the direct contact with merchants and the intermediary between merchants and other entities in the payment processing ecosystem.  Upon

information and belief, Merchant Lynx deals with iPayment, Inc. as its payment processor and Wells Fargo Bank, N.A. as its primary member bank.

**B.      Overview of Merchant Lynx and Its Deceptive Practices**

25.    Merchant Lynx is a self-described "leader in credit card processing" that offers payment processing services to merchants throughout the country.  Merchant Lynx not only offers payment processing services, but also equipment to facilitate credit and debit card transactions (e.g., card readers).

26.    Merchant Lynx employs a network of independent sales agents or brokers who market and sell Merchant Lynx's payment processing and related services.  These agents or brokers are not Merchant Lynx employees.  Merchant Lynx also uses in-house sales and other personnel which are its employees.

27.    Upon information and belief, even sales agents or brokers that are not Merchant Lynx employees are allowed to use the Merchant Lynx logo, a Merchant Lynx email address, a Merchant Lynx switchboard for telephone calls or faxes, etc.  These authorized agents or brokers are encouraged to give themselves titles suggesting that are employees of Merchant Lynx, even though they are not employed by the company.  They are allowed to pick their own titles, without regard for their actual position – sales agent or broker – for Merchant Lynx.  These agents or brokers, however, use Merchant Lynx's resources, training (to a limited extent), and paperwork.  In all respects, customers are given the false impression that the sales agents, and sometimes even the brokers, are part of the Merchant Lynx entity.

28.    Payment processing service companies make money by charging fees, often expressed as a percentage amount of individual transactions or total transactions.  For example, a company may charge 2% for each purchase a customer makes from the merchant with a Visa

card.  If the purchase was for $100, the payment processing service would charge the merchant $2.00 ($100.00 * .02 = $2.00).

29.     Payment processing service companies often charge different fees, at different rates, for different types of cards used (e.g., a Visa card versus an American Express card). Given the high-volume of retail purchases made with credit or debit cards, merchants' bills for payment processing services can quickly become very long and complicated, with many different line items to reflect all of the fee, rate, and other variables in play.

30.     Merchant Lynx markets itself as a simple, merchant-friendly alternative for merchants seeking payment processing services.  For instance, Merchant Lynx touts on its website that "[h]aving a credit card processing service is straightforward to use and once Merchant Lynx Services help [sic] you with the setup, the rest is easy."

31.     Merchant Lynx has crafted its marketing message and sales pitch accordingly.  It trains its own personnel, and outside sales agents and brokers, to pitch Merchant Lynx's services as hassle-free and without any catches.

32.     For instance, Merchant Lynx instructs its own personnel, and outside agents and brokers, to sell a "flat rate" plan to entice merchants with the promise of predictability. Merchant Lynx's "flat rate" plan promises a single, all-inclusive rate for all payment card transactions, so a merchant can better estimate what his payment processing service costs will be.

33.     Merchant Lynx's own sales materials reinforce this.  Merchant Lynx arms its sales personnel, and outside agents and brokers, with worksheets entitled "The Analysis," which sales people are encouraged to use with would-be customers.  These worksheets purport to calculate the merchant's "current" fees and effective "true rate" they are paying with their incumbent payment processing servicer.  Then, the worksheet purports to display how much the merchant would pay with Merchant Lynx.  The purported savings calculated by "The Analysis"

is based on a single, all-in percentage rate that the merchant would multiply against the merchant's total monthly sales to determine the merchant's monthly, all-in cost for payment processing services, plus a $5.00 "statement fee."  No other fees or charges of any kind are presented, or separately discussed.  The worksheet then highlights the "savings" the merchant would enjoy if it switched to Merchant Lynx.

34.     "The Analysis" worksheets are a hoax, intentionally designed to prey on merchants' desire to simplify their payment processing costs and to attain some level of monthly predictability of those costs.  In reality, once a merchant signs up with Merchant Lynx, it begins to charge the merchant a host of additional, previously undisclosed fees and charges.  Moreover, Merchant Lynx will also vary the supposed "flat rate" in arbitrary, unexplained manner.

35.     When confronted by unhappy merchants who realize Merchant Lynx's deceptive scheme, the company often claims it has a right to charge different fees or variable rates under the "merchant processing application."  This is a short, standardized form created by Merchant Lynx, which bears the Merchant Lynx logo.  On its face, the application purports to be just that – an application for payment processing services.  An example is attached as Exhibit A hereto. Among other things, it contains sections to be completed by the merchant about the merchant's name and address, the types of products or services it sells, and estimates on its monthly retail sales.  While the merchant signs the application, no one from Merchant Lynx (or anyone else for that matter) counter-signs it.

36.     The application contains some mention of fees under the heading "visa/mastercard/discover/American express risk evaluation."  Merchant Lynx's sales people, or outside agents or brokers, are supposed to complete this section.  However, in practice and by design, Merchant Lynx personnel, agents, and brokers gloss over this section with merchants, if they discuss it at all.  Instead, they are trained to make repeated reference to "The Analysis"

worksheets, which do not disclose the bevy of fees and other amounts Merchant Lynx routinely charges merchants.

37.     Moreover, Merchant Lynx sale people, agents, or brokers often attach an "addendum" to the application in which Merchant Lynx adds specific superseding terms or information.  While this is not counter-signed by Merchant Lynx or anyone else either, the addendum will identify the same "flat rate" quoted to the merchant that was used with "The Analysis" worksheet.  Also, as an addendum, it also supersedes whatever "fees" might be mentioned earlier in the application.

38.     Merchants are not given any other materials besides "The Analysis" worksheets when they sign-up with Merchant Lynx.  They are not even given copies of the "merchant processing application" or addendum.  Merchant Lynx trains and instructs its sales people, agents, brokers not to provide merchants with any other materials, lest the merchants uncover Merchant Lynx's deceptive scheme during the application process.

39.     By the time merchants begin to suspect Merchant Lynx's bait-and-switch, it is too late. They have already switched their payment processing services to Merchant Lynx.  After which, Merchant Lynx begins to charge whatever fees or rates it wants, irrespective of earlier oral and written representations, including "The Analysis" worksheets or addenda to the merchant processing applications, or even the applications themselves.

        **C.    Plaintiffs' Experiences With Merchant Lynx**

40.     Plaintiffs were approached by a Merchant Lynx representative in or about the Summer of 2015.  The representative explained that Plaintiffs could realize substantial savings in their monthly payment processing services costs if they switched away from their incumbent servicer to Merchant Lynx.  The representative asked for some of Plaintiffs' recent billing

statements from the incumbent, and for some related information about Plaintiffs' estimated monthly dollar sales volumes.  Plaintiffs provided these materials and information.

41.     The Merchant Lynx representative returned with a completed copy of "The Analysis" worksheet which purported to show that Plaintiffs would realize substantial savings if they switched to Merchant Lynx.  The worksheet is attached as Exhibit B hereto.

42.     The worksheet identified what Plaintiffs currently paid for payment processing services with their incumbent, and what Plaintiffs would pay with Merchant Lynx.  The worksheet reflects a 1.99% flat rate discussed by Merchant Lynx's representative.  That is, under the "MLS [Merchant Lynx Services] program," Plaintiffs' total monthly sales would be multiplied by a 1.99% single, flat rate for Visa, Mastercard, and Discover Card transactions to yield a monthly charge that would be owed to Merchant Lynx.  *See* Ex. B.  A slightly higher rate would apply to American Express transactions, but still at a single, flat-rate, and a cost below the incumbent's commensurate charge.  *Id.*  Finally, there was $5.00 monthly "statement fee," and a $60 monthly equipment fee.  No other fees, rates or charges were identified on the worksheet, or discussed by the Merchant Lynx representative.  Based on this analysis, the Merchant Lynx representative promised, and wrote in the worksheet, that Plaintiffs would realize hundreds of dollars in monthly savings (and thousands of dollars in yearly savings) if they switched to Merchant Lynx.  Merchant Lynx also offered to pay any cancellation fee that Plaintiffs would be charged by their incumbent provider.

43.     Plaintiffs decided to proceed with Merchant Lynx.  They executed the necessary paperwork to setup bank account information to facilitate payments, and completed Merchant Lynx's "merchant processing application."  The application for one Plaintiff is attached as Exhibit C hereto. The applications included a handwritten "addendum" that specifically stated that Plaintiffs were receiving a "flat rate 1.99%."  It also identified a $59.99 monthly equipment

charge.  Finally, it noted that Merchant Lynx would reimburse Plaintiffs for any early termination fee up to $495 charged by Plaintiffs' incumbent servicer, and that Merchant Lynx waived all "transaction fees."

44.    Neither Merchant Lynx nor anyone else ever counter-signed the applications or any other paperwork.  Merchant Lynx did not provide Plaintiffs with copies of the completed applications and related paperwork.  Plaintiff Liberty Salad obtained a copy of its completed application and related paperwork after much back-and-forth with Merchant Lynx, and nearly a year later.  Plaintiff 18th Street Salad has never been provided with a copy of its application and related paperwork.

45.    Right from the beginning with Merchant Lynx, however, numerous other fees appeared on Plaintiffs' monthly statements besides the promised 1.99% flat rate, the $5.00 monthly statement fee, and the $59.99 monthly equipment charge.  For instance, numerous additional fees were tacked onto the bills that were never disclosed by the Merchant Lynx representative, "The Analysis" worksheet, or the addenda to the applications.  These fees included various card-specific fees, as well as unexplained (and previously undisclosed) "miscellaneous fees," "customer service fees," and other fees.  The bills said to call Merchant Lynx regarding additional fees.

46.    Merchant Lynx also did not initially refund Plaintiffs for the cancellation fees they incurred from their former servicer.  Getting the cancellation fee paid by Merchant Lynx took countless phone calls and months of discussion.

47.    In addition to per-transaction fees or rates that Merchant Lynx charged Plaintiffs above and beyond those it previously represented, in April 2016, Merchant Lynx assessed a previously undisclosed $1,000 "programming charge."  Merchant Lynx also charged a variety of undefined dues and assessments.

48.    When all of the fees Merchant Lynx charged are totaled, on a monthly basis, Plaintiffs were paying significantly more than the 1.99% "flat rate" they were quoted.  Some of the undisclosed fees charged do not even appear on the merchant processing application forms, even if the addenda did not supersede them (which they do).

49.    The additional, undisclosed fees Merchant Lynx charged varied over time.  In some months, Merchant Lynx charged them.  In other months, Merchant Lynx did not. Merchant Lynx does not explain when or why it will charge certain fees, above and beyond the flat rate quoted to Plaintiffs.

50.    Plaintiffs had substantial difficulty in getting in touch with Merchant Lynx personnel to discuss these issues.  Plaintiffs have repeatedly attempted to reconcile the additional fees and overcharges with Merchant Lynx, but to no avail.

51.    When factoring in the additional, previously undisclosed fees and other charges Merchant Lynx has levied against Plaintiffs, Plaintiffs' effective monthly rates for payment processing services is about the same as the effective rates they were with their prior servicer.

52.    Plaintiffs' experiences with Merchant Lynx are not isolated, but rather are illustrative of Defendant's improper business practices towards its customers.

## CLASS ACTION ALLEGATIONS

53.    Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3), Plaintiffs bring this class action on behalf of themselves and all those meeting the following class definition:

> All United States persons or entities charged unauthorized amounts
> for payment processing services by Merchant Lynx.

Plaintiffs reserve the right to modify or amend the definition of the proposed Class, or add other proposed classes or subclasses, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

-13-

54.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

55.     The time period for the Class is the number of years immediately preceding the date on which this Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

56.     The proposed Class meets all requirements for class certification.  The members of the Class are so numerous that joinder is impractical.  The Class consists of, at the very least, thousands of members and the identity of those persons and entities is within the knowledge of Defendant and can be ascertained by resort to Merchant Lynx's records.

57.     The claims of the representative Plaintiffs are typical of the claims of the Class. Plaintiffs, like all other members, were victimized by Merchant Lynx's improper practices. Moreover, Plaintiffs, like all members, have incurred monetary damages as a result of Merchant Lynx's misconduct.  Furthermore, the factual basis of Defendant's misconduct is common to members of the Class, and represents a common thread of conduct resulting in injury to all members of the Class.

58.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

59.     Among the questions of law and fact common to the Class are:

        a.      The nature of Merchant Lynx's misrepresentations or omissions, and the materiality thereof;

        b.      Whether Merchant Lynx assesses or increases undisclosed or otherwise improper fees or charges, and in what amounts;

        c.      Whether merchants received any tangible benefit from the improperly assessed fees or charges;

-14-

     d.     Whether Merchant Lynx's standardized application form (or any other document) creates a valid, bilateral contract;

     e.     Whether Merchant Lynx was unjustly enriched by its wrongful conduct;

     f.     If a contract exists, did Merchant Lynx breach any terms, or the covenant of good faith and fair dealing;

     g.     If a contract exists, did such contract include unconscionable, void, or voidable, or otherwise unenforceable provisions;

60.     Other questions of law and fact common to the Class include:

     a.     The proper method or methods by which to measure damages, and

     b.     The declaratory or other equitable relief to which the Class may be entitled.

61.     Plaintiffs' claims are typical of the claims of other members of the Class in that they arise out of the same wrongful policies and practices and the same or substantially similar unenforceable provisions of the unexecuted contracts and related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other member of the Class.

62.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

63.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Merchant Lynx, most Class members could not afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will be unable to obtain redress for their losses and Defendant's misconduct will have occurred without remedy.

64.     Even if Class members themselves could afford such individual litigation, the court system could not.  Individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.   By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

65.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendant.

66.     Defendant has refused to correct its conduct and such inaction is generally applicable to the Class, thereby making appropriate injunctive relief or corresponding declaratory relief with respect to the Class as a whole.  Specifically, Merchant Lynx continues to knowingly overbill the Class and to enforce unconscionable or otherwise unenforceable contractual provisions.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

### REQUESTS FOR RELIEF

**COUNT ONE**
**DECLARATORY AND INJUNCTIVE RELIEF –**
**NO BINDING CONTRACT EXISTS**

67.     Plaintiffs repeat the foregoing paragraphs as if set forth herein.

68.     Class-wide declaratory relief is appropriate where a Defendant has "acted or refused to act on grounds that apply generally to the class."

69. Defendant has established a system through which it obtains merchant signatures on its form applications but it does not itself sign (or have any other entity sign). Absent such, no contractual relationship is ever actually formed between the parties.

70. A judicial declaration as to whether a contract exists is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to one another.

71. The Court should use its equitable powers to declare that (1) the unexecuted contracts (consisting of application and any other related materials) are not binding contracts and (2) Plaintiffs and the Class are not bound by any of the terms set forth in the contract (including early termination fees).

## COUNT TWO
## UNJUST ENRICHMENT

72. Plaintiffs repeat the foregoing paragraphs as if set forth herein.

73. Plaintiffs assert a common law claim for unjust enrichment. Given the parties do not have an enforceable contractual relationship, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

74. As alleged herein, Merchant Lynx was unjustly enriched at the expense of Plaintiffs and the other members of the Class, who were grossly and inequitably overcharged for payment processing services.

75. Plaintiffs and the other members of the Class were unjustly deprived of money obtained by Defendant as a result of the improper and excessive fees that Merchant Lynx charged and collected from Plaintiffs and the other Class members.

76. It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other members of the Class as a result of their wrongful conduct alleged in this Complaint.

77.     Plaintiffs and the other Class members are entitled to seek and do seek restitution from Defendant as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

**COUNT THREE**
**BREACH OF CONTRACT INCLUDING BREACH OF THE COVENANT**
**OF GOOD FAITH AND FAIR DEALING**

78.     Plaintiffs repeat the foregoing paragraphs as if set forth herein.

79.     This claim is brought in the alternative to Counts One and Two, *supra*.  In the event a valid contract is found to exist, the actions taken by Merchant Lynx have materially violated the specific terms of such contracts.  Merchant Lynx is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

80.     Merchant Lynx violated the contract by assessing improper charges not provided for in the contract, to include improperly inflated charges, additional fees not even mentioned in the contract, and charges which should have been waived, and by unilaterally marking up agreed-upon fees and charges without legal basis and without proper notice.  This includes, but is not limited to, any superseding terms set forth in addenda.  Thus, Merchant Lynx has materially breached the express terms of its own form contract.

81.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts, or those obligations have been waived by Merchant Lynx.

82.     Plaintiffs and members of the Class sustained damages as a result of Merchant Lynx's breaches of contract.

83.     The law also imposes upon each party to a contract the duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to

comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

84.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

85.    By charging fees that are inconsistent with those laid out in the contract, including but not limited to increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, Merchant Lynx has violated the spirit of the contract and breached the covenant of good faith and fair dealing.  Even if Merchant Lynx believed that it had given itself contractual discretion to increase markups and fees, or add new fees, such discretion is constrained by good faith and fair dealing under applicable law and Defendant's actions do not comport with this duty.

86.    Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no excuse or defense for Merchant Lynx's conduct under applicable law.

87.    Plaintiffs and members of the Class sustained damages as a result of Merchant Lynx's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.  As such, all elements for a successful claim under applicable law have been satisfied.

## COUNT FOUR
## DECLARATORY AND INJUNCTIVE RELIEF – INVALIDITY OF CERTAIN CONTRACT TERMS

88.    Plaintiffs repeat the foregoing paragraphs as if set forth herein.

89.     Class-wide declaratory relief is appropriate where a Defendant has "acted or refused to act on grounds that apply generally to the class."

90.     Defendant has increased agreed-upon fees and rates and attempted to immunize itself from liability for its practices by burying provisions in the adhesive contract that purport to make it virtually impossible for merchants to obtain relief from Defendant's overbilling practices.

91.     Such provisions should be deemed unenforceable on multiple grounds, including because they are illusory, lack mutuality, and violate public policy.

92.     Moreover, considering the great business acumen and experience of Defendant in relation to Plaintiffs and the members of the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

93.     Thus, a judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to these provisions.

94.     The Court should use its equitable powers to declare these provisions to be unenforceable and enjoin their enforcement.

**COUNT FIVE**
**COMMON LAW FRAUD –**
**MISREPRESENTATIONS, OMISSIONS, FRAUD AND FRAUDULENT INDUCEMENT**

95.     Plaintiffs repeat the foregoing paragraphs as if set forth herein.

96.     Defendant affirmatively misrepresented material facts, including, *inter alia*:

    a.     Defendant, by and through its authorized ISO's and sales agents, communicated directly with the Plaintiffs and other potential merchant

-20-

class members, the terms and conditions it offered for payment processing services.

b.     This communication took place at the time Defendant was attempting to convince merchants to use it's payment processing services;

c.     The rates offered were simple and straightforward, including a flat rate for all Visa and Mastercard charges and another flat rate for all American Express charges;

d.     The method that Defendant used to communicate this message were worksheets, called "The Analysis," which allegedly inputted the merchant's recent transaction history or anticipated transaction history and applied the merchants' "current" rates, fees and costs, to provide to the merchant an effective "true rate" they are paying with their incumbent payment processing servicer or other would-be competitors in the industry.

e.     Then, The Analysis purports to display how much the merchant would pay with Merchant Lynx.  The purported savings is based on the flat rates offered to the merchant by Merchant Lynx, which simply multiplies the merchant's total monthly sales to determine the merchant's monthly, all-in cost for payment processing services, plus a $5.00 per month "statement fee."

f.     No other fees or charges of any kind are presented, or separately discussed.  The worksheet then highlights the "savings" the merchant would enjoy if it switched to Merchant Lynx.

g.     If the merchant agreed to switch to or begin using Merchant Lynx, a document was presented to the merchant.  The printed terms of the document were never discussed by ISO's and sales agents.

h.     Instead, the ISO's and sales agents only discussed The Analysis and the hand written flat rate terms on the document.  Other than the $5.00 "statement fee" and paying any early termination fees of previous payment processors, no other fees, rates or costs were discussed or presented.

i.     Defendant insists that merchant sign the agreement, but do not sign it on behalf of the Defendant, and do not provide any document signed by the Defendant obligating it to anything.

97.     Consistent with the above, Defendant failed to disclose material facts to render non-misleading its statements about, *inter alia*:

a.     Defendant did not mention the existence of a *Program Guide*, the terms of any such Program Guide, or that there existed any document separate and

apart from what was presented to the merchant, that was incorporated into the arraignment made between Defendant and Plaintiff.

b.    The ISO's and sales agents do not carry with them the *Program Guide* or any other document shown to the merchant as part of the arraignment with them other than what was presented to the Plaintiffs.

c.    No terms or conditions that exist within, or are referenced within, the *Program Guide* or any other document not shown to the merchant, were disclosed to the merchant and accordingly, do not bind the merchant, or at a minimum, cannot be considered materials to the arraignment with them.

d.    Defendant failed to disclose that any rates other than the flat rates, the $5.00 "statement fee," and paying any early termination fees of previous payment processors, were part of any arraignment between the parties. To the extent that any other fees would be charged, or that the fee structure would be anything but the above rates mentioned, would be obvious, important and material omissions.

e.    Defendants' failure to disclose the fact that it would *sua sponte* and without notice change the terms offered such as to charge additional costs, fees, either directly or as a pass through, a higher rate, or anything other than what was disclosed, amount to materials omissions.

f.    The failure to disclose the rates, fees and costs that were charged the Plaintiffs and other merchants not included in The Analysis occurred on an ongoing basis during the entirety of the business relationship between the parties and the putative class, and these material omissions continue to date.

98.    Consistent with the above, Defendant's actions had the effect of fraudulently inducing customers to switch payment processing services to Defendant, in that, *inter alia*:

a.    Had the Plaintiffs and the class known that some unknown other documents, including but not limited to the *Program Guide*, and the terms and conditions therein, of any such Program Guide, existed separate and apart from what was presented to the merchant, the Plaintiffs and the class would not have engaged Defendants in payment processing services, or would have paid less or required the fees, rates, and costs of such services be decreased considerably.

b.    Had the Plaintiffs and the class known that Defendants were omitting materials information regarding the terms and conditions offered, including but not limited to any term that defined, altered or impacted their ability to go to Court and remedy actions taken by the Defendant, the Plaintiffs and the class would not have engaged Defendants in payment processing services, or would have paid less or required the fees, rates, and costs of such services be decreased considerably.

c.    Had the Plaintiffs and the class known that Defendants were charging anything other than the flat rates offered, the Plaintiffs and the class would not have engaged Defendants in payment processing services, or would have paid less or required the fees, rates, and costs of such services be decreased considerably.

d.    Had the Plaintiffs and the class known that Defendants would change the cost structure charged for payment processing services in any material way, including but not limited to charging tiered rates, a cost plus method, or adding to the rates, costs, fees, and pass-throughs, the Plaintiffs and the class would not have engaged Defendants in payment processing services, or would have paid less or required the fees, rates, and costs of such services be decreased considerably.

e.    The Plaintiffs and the class were induced to work with Defendants based on the promise of a simple, flat rate pricing structure and no hidden fees, costs, rate increases, or unknown terms and conditions.  To the extent anything but that promise was delivered, the Plaintiffs and the class would not have engaged Defendants in payment processing services, or would have paid less or required the fees, rates, and costs of such services decreased considerably.

99.    Defendants knew, or reasonably should have known, that its representations, directly and through ISOs or sales representatives alleged herein, were materially false or misleading, or that the omission of material facts rendered such representations false or misleading.

100.    Defendants also knew, or had reason to know, that its misrepresentations and omissions would induce Class members to pay to switch to use its payment processing services.

101.    Defendants' misrepresentations and omissions were material and a substantial factor in Plaintiff and Class members' switching to and deciding to pay for its payment processing services.

102.    Defendant intended its misrepresentations and omissions to induce Plaintiffs and Class members to pay to switch to (and to remain with) Defendant for its payment processing services, or had reckless disregard for same.

103.    But for these misrepresentations and omissions, Plaintiffs and Class members would not have switched to (and remained with) Defendant for its payment processing services.

104.    Plaintiffs and Class members were justified in relying on Defendant's misrepresentations and omissions.  The same or substantively identical misrepresentations and omissions were communicated, to each Class member, including through a standardized process.

105.    Plaintiffs and Class members were damaged by reason of Defendant's misrepresentations and omissions alleged herein.  Specifically, they were overcharged for payment processing services.

* * *

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, demand a jury trial on all claims so triable and judgment:

1.    Certifying this case as a class action pursuant to Fed. R. Civ. P. 23;

2.    Awarding declaratory and injunctive relief as requested herein;

3.    Awarding restitution of all improper fees and charges paid to Defendant by Plaintiffs and the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

4.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

5.    Awarding actual damages in an amount according to proof;

6.    Awarding compensatory, general, nominal, and punitive and exemplary damages, as allowed by law;

7.    Awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

8.      Reimbursing all costs and disbursements accrued by Plaintiffs in connection with

this action, including reasonable attorneys' fees pursuant to applicable law; and

9.      Awarding such other relief as this Court deems just and proper.


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury to the full extent permitted by law.

Respectfully submitted,

Dated:  January 17, 2017

*/s/ KJG2445*

Richard M. Golomb, Esquire
Kenneth J. Grunfeld, Esquire
David J. Stanoch, Esquire
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (215) 985-9177
Fax:    (215) 985-4169
Email: rgolomb@golombhonik.com
            kgrunfeld@golombhonik.com
            dstanoch@golombhonik.com

*Attorneys for Plaintiffs and the Putative Class*