IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LIBERTY SALAD, INC., et al** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **GROUNDHOG ENTERPRISES, INC.** | : | **No. 17-CV-226** |

<u>**MEMORANDUM AND ORDER**</u>

Ditter, J.                                                                                                                              September 21, 2018

This case comes before me on cross-motions for summary judgment. In essence the defendant asks me to find that its contract of adhesion governed the business conduct of the parties. The plaintiffs seek a ruling that the contract never became effective and that an implied contract should be found, together with its terms, from the parties' conduct. For the reasons that follow, I will deny the defendant's motion and grant that of the plaintiffs.

**I. SUMMARY JUDGMENT**

The standards for summary judgment have often been stated. In brief, a party moving for summary judgment must show the absence of a genuine issue of material fact and that the facts it advances show it is entitled to judgment as a matter of law. A genuine issue of material fact exists if a reasonable factfinder could return a verdict in favor of the non-movant. The Court may not make credibility determinations but must draw all reasonable inference in favor of the non-movant.

**II. FACTS**

Defendant Groundhog Industries, Inc., does business as Merchant Lynx Services. In the late summer of 2015, Joseph P. Cattie, the owner of Liberty Salad, Inc., and Eighth Street Salad,

1

Inc., ("Liberty")[1] was approached by Mike Lisetski, a sales representative of Merchant Lynx ("Lynx"). Lisetski proposed that Cattie use Lynx to process his credit card services. After receiving information about Cattie's current credit card costs, Lisetski prepared a written analysis that showed Cattie how a switch to Lynx would save Cattie money – basically, there would be a flat rate fee of 1.99% on all Visa, Master Card, and Discover transactions and two small monthly fees, but Lisetski assured Cattie no additional fees would be charged throughout the life of the contract.

Cattie agreed to make the switch and without reading it, on August 10, 2015, signed a four-page application that included by reference a voluminous Program Guide and Cattie's acknowledgment that he had received a copy. Neither Lisetski nor Mitchell Reisbcrg, Lisetski's boss who was present for one of the meetings with Cattie, ever mentioned the Program Guide or gave a copy to Cattie. In fact, the Program Guide had never been mentioned during their training, nor had Lisetski or Reisberg ever seen a copy of it.

The Program Guide's terms allowed Lynx to charge Cattie additional fees and Lynx did so despite Cattie's objections.

> The Application also provides:
>
> By signing below, Merchant and the Undersigned, agree, acknowledge and understand that: a) The Agreement will not take effect unless and until Merchant has been approved by Bank and IPayment and Merchant is assigned and issued a Merchant Account Number; b) Any alteration, strikeover or modification to the preprinted text of this Application or the Agreement shall be of no effect whatsoever and at Bank's and IPayment's discretion may render the Agreement invalid. . . .

---

[1] Although we are concerned with both of Cattie's businesses, Liberty Salad and Eighth Street Salad, what applies here to Liberty also applies to Eighth Street. For ease of expression and understanding, I will refer to just Liberty but mean Liberty and Eighth Street and my findings and conclusions will refer to both plaintiffs.

At the bottom of the page there is a place for the merchant to sign and Cattie did so.

In addition there is the following:

| APPROVED/ACCEPTED: | APPROVED/ACCEPTED: |
|---|---|
| By:_____Date_____ | By_____Date_____ |
| Wells Fargo Bank,N.A.1200Montago, Walnut Creek, CA 94598 | IPayment, Inc. P...O. Box, Thouand Oaks, CA 91359 |

There is no signature for either the bank or IPayment.[2]

On the following page under the heading, Card Organization Disclosure, Visa and Master Card are listed as is Wells Fargo's address. Then:

> Important Member Bank Responsibilities:
> (a) . . . .
> (b)  The Bank must be a principal (signer) to the Merchant Agreement.
> (c) . . . .
> (d) through (e) . . . .

## III. DISCUSSION

### A. Lynx Motion for Summary Judgment

Lynx raises several contentions in support of its motion for summary judgment, all of which are intended to show that the Application and Program Guide took effect and therefore bound Liberty.

I will consider each of those contentions.

#### 1. Signatures Not Required.

Lynx first argues that while Liberty had to be approved and accepted by Wells Fargo in order for the application (and thus the Program Guide) to take effect, the fact that Liberty was

---

[2] IPayment sells accounts for Wells Fargo and Merchant Lynx sells accounts for IPayment. Wells Fargo provides services for IPayment accounts.

assigned and issued a Merchant Account Number shows it had been accepted and approved by both Wells Fargo and IPayment, making their signatures on the application unnecessary. I am not convinced.

In the first place, the application was prepared by Lynx, tendered by Lynx to Liberty, could not be altered, and therefore must be construed against Lynx. The application does not say it will become effective when Wells Fargo issues a Merchant Account Number. Quite to the contrary – there must be approval by Wells Fargo and IPayment **and** a Merchant Account Number has been assigned and issued – "and a Merchant Account Number has been assigned and issued." And means and. If Lynx did not intend that signatures by Wells Fargo and IPayment under the words Accepted/Approved were required to show approval of the application, why are those lines there? The question answers itself.

In further support of its contention that the application did not need to be signed, Lynx cites cases that hold the inclusion of signature lines does not mean a contract has to be signed to be valid absent the intent of the parties that signatures are required. Here that intent is found in Lynx's document that included places for Wells Fargo and IPayment to sign under the words Approved\Accepted and the provision that the application did not become effective unless it was approved by Wells Fargo and IPayment.

Next, Lynx asserts that there is no specific language in the application it prepared that says it must be signed to be effective. True. While the application does not say it must be signed to make it effective, it does state specifically the consequence of its **not** being signed. Moreover, the inclusion of the signature lines for Wells Fargo and IPayment provide any further need for specificity.

As noted above, the application also includes the following:

Card Information Disclosure, Visa and Master Card
Important Member Bank Responsibilities:
(b) The Bank must be a principal (signer) to the Merchant Agreement.

Lynx contends that the inclusion of these provisions on the application it prepared ". . . does not state the expectations (sic) of Merchant Lynx, Wells Fargo, or Liberty. Rather, it explicitly sets forth only the expectations (sic) of the credit-card organizations." In other words, when it says Wells Fargo must be a signer to the Merchant Agreement it does not mean that Wells Fargo must sign the Merchant Agreement. Rather it only means what the credit card organizations expect some time, somehow.

Lynx is wrong.

This provision does not merely state expectations. It sets forth Wells Fargo's responsibilities. It is an absolute guarantee to Visa and Master Card that Cattie's application will be signed by Wells Fargo for the application to take effect. It follows that since Wells Fargo did not sign the application it did not take effect. There is simply no other way to interpret the words that Lynx has chosen and its consequences.

2. **The Application Was Signed**

(a) **By a Later Action**

While not conceding that the application had to be signed, Merchant Lynx asserts it was signed in a timely way.

A further statement of the facts is required.

Cattie signed the Merchant Application form on August 10, 2015, and shortly thereafter, Liberty began to use services provided by Lynx. However, Cattie became dissatisfied with Lynx

because it imposed new and increased fees that raised his charges above the 1.99 percent he had been promised. His protests were ignored and the charges continued.

On January 17, 2017, this class action law suit was filed. At that time, Liberty's application had not been signed by either Wells Fargo or IPayment. In the fall of 2017, Liberty changed service providers thus ending its business relationship with Lynx.

On November 9, 2017, the application was signed by IPayment but back-dated to make it appear to have been signed on August 14, 2015. First Data was asked to sign on behalf of Wells Fargo but no one from First Data was willing to do so. Instead, on or about November 9, 2017, First Data employee, Ali Sarkarati, affixed a .PDF box with the word "ACCEPTED, " on to the Application. Not APPROVED as required by the application – just ACCEPTED.

Lynx contends that this process of back-dating and affixing which took place two years and three months after the parties started their business relationship, two months after that relationship ended, and ten months after this suit was brought, provided in a timely way the required signatures of Wells Fargo and IPayment.

I am minded of what any country boy can tell you – locking the barn after the horse has been stolen doesn't get the horse back.

I conclude that these resuscitation efforts of Lynx were in vain and the application remained unsigned.

### (b) The Application was Signed by a Logically Associated Process

Lynx points to both federal and Pennsylvania law that provide that a signature can be by any process logically associated with a record and executed or adopted by a person with intent to sign the record.

Referring to both Liberty and Eighth Street, Lynx's brief goes on:

Here it is clear that Well Fargo's designated agent approved the Merchant-Plaintiffs after reviewing them in their underwriting process. . . . When it passed underwriting a Wells Fargo Merchant Account Number was assigned to Plaintiffs. . . . Because this process was set forth in the Agreements, the process was certainly logically connected to the Agreements. Under the terms of the Agreements, the E-Sign Act, and the PETA Act, [federal and Pennsylvania laws] were deemed signed at the conclusion of that process. Since that process had to occur prior to the commencement of credit-card services, Plaintiffs cannot argue that this signature came too late.

Notably missing from Lynx's brief are two things. First, there is no assertion that by going through the underwriting and approval process, Wells Fargo's designated agent intended to sign the applications as the statutes require.

Second, there is no assertion covering IPayment's required signature. IPayment never even got into the barn.

In summary, I conclude that the application prepared by Lynx in order to come into effect required the signatures of Wells Fargo and IPayment. Neither signed the application. The application did not come into effect. Since the application did not come into effect, neither did the Program Guide. Defendant's motion for summary judgment was completely dependent upon the application and Program Guides becoming effective. Defendant's motion for summary judgment must be refused.

**B. Liberty's Motion for Summary Judgment**

I now turn to Liberty's motion for summary judgment.

Since there is no written contract here but Lynx provided service to Merchant for more than two years, an implied contract was created. The only question is its terms.

When Lisetski and Reisberg met with Cattie in the summer of 2015, they told him that Liberty (and Eighth Street) would be charged a flat rate of 1.99% for all Visa, Mastercard, and

7

Discover transactions. In addition there would be a charge of $59.99 per month for 48 months to pay for process equipment, and finally, a monthly Statement Fee of $4.95. Except for the monthly Statement Fee, these terms were reduced to writing on an Application Addendum which also contained an agreement by Lynx to reimburse Liberty for up to $495 for any early cancellation fee due Liberty's former service-provider. Cattie was assured the flat rate would never change and there would be no other fees.

Shortly after Cattie signed the agreement, Lynx began to provide the necessary services.

However, Cattie found Lynx was charging him additional fees. When he protested, Lynx temporarily dropped the additional fees -- but only temporarily. When additional fees were again added to his monthly invoices, Cattie paid but under constant protest.

I conclude that the undisputed facts show that there was an implied contract between Liberty and Lynx. In return for Lynx's processing services, Liberty agreed to pay:

1) a flat rate fee of 1.99 % for all Visa, Mastercard, and Discover transactions;
2) a $4.95 monthly Statement Fee; and
3) for 48 months a monthly fee of $59.99 for processing equipment.

Lynx agreed to reimburse Liberty for up to $495 paid to Liberty's former servicer for terminating it.

## IV. CONCLUSION

First, I remind the parties that my findings and conclusions apply to both Liberty and Eighth Street.

Second, I am denying Lynx's motion for summary judgment on its claim that the parties entered into an express written contract. I find that there was an implied contract with the terms set forth above.

Third, Liberty's claims for unjust enrichment (Count two), fraud (Count five), and a breach of an implied covenant (Count three) are denied.  My explicit instruction to the parties was to conduct discovery and briefing on the narrow issue of whether there was a written contract or an implied contract, and if the latter, its terms.  In short, Lynx's motion is premature.

An appropriate order follows.